Morning. Good morning. My name is John Seidlitz. I want to thank you for the opportunity to present oral argument on behalf of Arlene Yarger. I'm a little confused. I had Lund set first here in my head. So I'm going to... Kathy, is the clock running? Yeah, there we go. Do I need to allocate before and after? If you want to reserve some time, that's fine. You can use up all your ten minutes now. All right. I'm going to go ahead and reserve maybe a minute. Arlene Yarger is an individual who applied for Social Security disability benefits and after pursuing a career as a professional, as a case manager, could not continue in that, switched positions, began doing work as a hairdresser part-time in a nursing home. That brings us to some of the reasons that the judge ALJ at the lower level ignored that really cause and relate to her disability. She was found to have, by the ALJ, severe diabetes, obesity, and myalgias. The issue that brings us here relates to an embarrassing subject for her and for me to present to you, but fecal incontinence. The judge specifically found that fecal incontinence was not established by medically acceptable clinical and diagnostic techniques. So he found that it did not significantly affect her ability to work, so it was not severe. What occurs, the facts in terms of her work, when she changed work, she began working as a hairdresser. She worked part-time. She worked in a nursing home. The reason she was doing that part-time work in a nursing home was the fact that the odor from urinary and fecal incontinence, in her testimony, blended in with the residents. In spite of that, the severity was so bad that she would be required, she wore pads, she had multiple changes. On a routine basis, she would need to take more than one shower a day and bring changes of clothes. The ALJ rejects the issue of fecal incontinence. I don't know why. I will hear from counsel, I guess. He suggests there's only two references to it. There's only two references in the doctor's records to fecal incontinence. What there is in the records is objective findings for the cause of the fecal incontinence. With a digital test, Dr. Mahan finds that she has minimal, if any, internal and external sphincter control. And it's also related to her diabetes, right? It is. The treating physician, Dr. Buffington, opines in a letter that was submitted, it's autonomic neuropathy, which is a peripheral neuropathy away from the brain affecting involuntary bodily functions. And so that's established. It's established that she has that difficulty. What was the ALJ's objection to this? He says it has not been established by medically acceptable clinical and diagnostic techniques. What does that mean? There is, in fact, a medical finding, a very specific one, as to the cause of that. Well, I think that the finding's there. My argument in my brief was that he could only be talking about the effect of the objective finding. In other words, there was no objective evidence of how often she's suffering from fecal incontinence. That's all I can – I don't know how else to answer that. Because the condition exists. It's objectively established. Let me ask you this. I mean, it sounds like you've got a pretty good case that she suffers from that condition, but I'm not clear why she can't work. You said before she could bring a change of clothes and there are places where she can work and just have to shower more frequently. What makes her totally disabled? The reason she's totally disabled is she's working at 12 hours. That's the maximum she's working. In spite of that, she has to – and she's testified to that – she has to juggle schedules because if something happens to her and she's got to go home and do a shower, she's got to rebook people. She's got to change people. The testimony from the vocational expert is that if you're taking breaks of more than the normal 15-minute morning and afternoon and the normal lunch break, if you're taking more of those on an occasional basis, then you're not going to be employable. If that's a routine more than just once a month or twice a month, then you're not going to be able to be employed full time. And her testimony is that this condition affects her. Not that there are not days that she can put in – I think the testimony was three or four hours of doing hair – but the fact that on the days when she cannot, and it happens routinely throughout the month, she's got to take time out. She's self-employed, and so that's how she's able to continue with this hair work without an employer saying – Was this – was the vocational expert asked to include this problem in the analysis? The way that ALJ phrased it, and it's at 536 of the transcript, is when the ALJ gets to everything else, he runs through some scenarios. His fourth hypothetical in this case is if you miss more than two days a month on an occasional basis or more than two 15-minute breaks or the 30- to 60-minute lunch break, then the vocational expert testified you cannot do substantial gainful activity. But he didn't specifically factor it in. No, the judge did not ask and review specific medical issues. It was just a timeframe in terms of if limits were imposed on these specific times. But also the odor issue specifically he didn't ask. He did not address the odor issue at all, at all. In terms of the – I think the issue on credibility in terms of the problems she had from this, by January of 05 we have this objective test. When you back up through the records, it's mentioned more than once, and I think it relates all the way back to 01. She comes in and she mentions she's having occasional urinary tract infections. Subsequently, as the records develop when they get down, her treating physician is going to indicate that is being caused in the records in about 04. He starts to relate the urinary infections to this, to the bowel leakage. And she also says it's getting worse. And she said it had been worse. In fact, she had worked with this, but eventually it gets worse, and over the course of time gets to the point where the only thing left is this part-time, 12-hour-a-week self-employed position in the nursing home where she can juggle her clientele. The clientele are all nursing home residents. Dr. Buffington's opinion was not presented to the ALJ? Dr. Buffington's opinion was and was rejected. The ALJ found it was inconsistent with the state agency. That's at transcript 22. Dr. Buffington's opinion, he gave two opinions. He gave a physical opinion and he gave a mental opinion. The mental opinion related to other problems which she had, including depression, and he found she had marked limitations in terms of depression and how both the diabetes and depression and the limitations caused by the diabetes was affecting her. In terms of functional capacity, Dr. Buffington indicated what she could do physically because physically she could still do things. It's a function of at times she's going to suffer from this. Dr. Buffington did write a letter after the ALJ opinion, right? I can't tell you. The August letter that he wrote. The letter he wrote September 8 of 2006. I thought that was, I didn't realize that was after. I thought that was shortly before, but I could be mistaken. Yes, it was after the hearing. It was after. So his opinion was not presented to the ALJ. I can't. I wrote down the date of the hearing. I don't remember what the date of the decision was. It may well have been after the decision. Certainly the appeals council had that to review in the district court. I don't know if the letter of September 8 of 2006 added. But that's a very subjective letter. I mean the tone of it is very subjective. I don't think it's subjective. What happens is you have Mahan who has. So it's McMahon actually. I appreciate that. I get called McMahon. There's no muck on mine, and there is on his. That's strictly personal. And the doctor had already, previous to this, indicated the objective digital test in terms of there's just no sphincter tone. And so when Dr. Buffington comes through, diabetes has been throughout the records. And so when he comes in and explains in September of 2006, this is a neuropathy problem. But, I mean, the tone of his letter is this is horrible. How embarrassing for the first name Arlene. Yes, Arlene. Embarrassing for Arlene. It's just subjective comments like that that really undermine the whole letter. Well, I don't know. I mean I think in terms of the subjective, I think this was an embarrassing subject. I don't know. It's not in the records. I don't know how it's discussed between the doctor and the patient. But certainly it's a common experience. It's something. But isn't Dr. Buffington's letter could be totally disregarded and we're still in the same place. I don't think it changes anything except he finally puts the definition of autonomic neuropathy. But there is an actual diagnosis by a different doctor earlier. Correct. Correct. My time is up. Yes, thank you very much. Thank you. Good morning. Good morning. My name is Alan Berger and I represent the Commissioner of Social Security. May I please report? Judge Mann, just to address a point about Dr. Buffington's opinion, it was submitted to the Appeals Council after the ALJ issued the decision. Apparently as a result of Ms. Yarger's attorney writing a letter to Dr. Buffington, the letter that he wrote to Dr. Buffington is not in the transcript. It appears they wrote to Dr. Buffington saying that the ALJ found that she was not disabled. Can you respond to that? It's a technical matter. How does that affect whether it's in the record before or if it wasn't in the record before? I'm just, I don't know how this works. First of all, does the Appeals Council consider additional evidence in general? Yes, they are. The Appeals Council will consider all the evidence up until the time the Appeals Council issues a decision. So they got the letter. So it therefore is in the record that we're reviewing? Yes, Your Honor. But it's kind of a strange review of the record that the court has. Instead of looking at to see if the ALJ's decision is supported by substantial evidence in the record, the court should look at would an ALJ looking at Dr. Buffington's letter have made a different decision than he made initially? And in this case, the answer is no because what happened, as Judge Mahan pointed out, is Dr. Buffington really put in a subjective basis for his analysis. But there is evidence in the record, specific evidence. That's why it's very hard to understand what the ALJ is saying when he says there was no medical evidence. There was very specific medical evidence. So what is he saying? It's not been established by medically acceptable clinical and diagnostic techniques, but there was a very specific finding in Dr. McMahon's data about what's wrong here. So why is he saying that? There was one finding, Your Honor, but there were other findings after that. For example, in July of 2005, which is at transcript or exhibit page 382, a rectal examination was unremarkable. But that's different than saying it has not been established by medically acceptable clinical and diagnostic techniques. He seems to be saying there's nothing there, not that there's a conflict and he's resolving it. He simply is saying there's nothing there, and that's not true. It's wrong. Your Honor, I would not disagree, and the commissioner would not disagree. However, if that is an error, it is an error that is not relevant to the court's decision because essentially what that is is an error at step two of the sequential evaluation, perhaps, finding that one specific impairment is not severe. But the purpose of step two is to find whether someone has a severe impairment. If they are, they go on to the next part of the sequential evaluation. So it doesn't matter if someone has one or 50 severe impairments. If the ALJ finds one and there are 49 more, they go on with the sequential evaluation. But doesn't the judge have to take into account what that impairment is in order to figure out the residual functional capacity? Absolutely, Your Honor. That was where I was going to step four because then you look at the residual functional capacity where the commissioner has a responsibility to consider all impairments severe and not severe. And the question really, when you go down to it, and you really put a fine point on it, is how much inconvenience did her impairment cause? And essentially the ALJ found that she was able to perform the full range of work. But again, he didn't cope with this. He says, nor is there evidence that this impairment would significantly affect the claimant's ability to work. Well, again, there was evidence. She said, and she explained why, and if he was going to disregard her, he had to say why, and he didn't. She explained why it significantly affected her ability to work very specifically. If he wasn't going to believe her, he had to deal with it. He did deal with it, and he did. There's no evidence. That's wrong. There was evidence. I understand, Your Honor. But, again, that's at the step two. If we go into the step four where he's doing the residual functional capacity assessment, that's where he does the credibility assessment. And she testified that she was able to do the job of hairdresser for 12 hours a day. And when the ALJ asked her why, or her attorney, I'm not sure which one, asked her why she wasn't able to work any longer, he didn't say it was because of her incompetence. In the transcript page 505 and 506, she said it was because she had arthralgias and it hurt. And that actually makes sense because the cosmetologist's position was something that she couldn't do because it exceeded her residual functional capacity. Did a V.E. testify in this case? Yes, Your Honor. Was the V.E. asked to assume that she had this incompetence problem? No, Your Honor. Isn't that fatal to you? No, Your Honor. It would be fatal if the ALJ didn't do an acceptable credibility assessment or if the ALJ found that she had fecal incontinence that caused her to need to take more than the two breaks in the morning and the afternoon and the lunch break. Because he backed that out by finding it non-severe, he never got to that question. Right? You're essentially saying he erroneously found it non-severe. So he therefore never got, he never, he just backed it out at the beginning and he never really coped with the question as he went down further analyses of how it affected her residual capacity. We don't know that, Your Honor. We don't have any evidence that he did. Your Honor, we don't have the evidence that we did. What we look at and what the commissioner looks at is the credibility assessment. The whole question of whether she needed to take more than two breaks in the morning and the afternoon is based upon her credibility. And the ALJ gave specific and legitimate reasons for finding she was not credible. Therefore, he didn't accept her testimony generally regarding the severity of her impairments. And one of the things that she testified to as to the severity of her neuropathy was fecal incontinence. Where is the credibility finding that you're talking about? It's on page 22, Your Honor. Where he talks about, at the first paragraph on page 22, he talks about the activities of daily living, work activity are higher than their If you were taking into account her, this particular issue, you might come to a different conclusion because the ability to do household chores and all this stuff at home has nothing to do with what she says her problem is and why she can't work. So it's sort of apples and oranges. Because he's already backed it out, he's not taking that into account and looking at the daily living question. Your Honor, I would agree that we would want the ALJ to specifically address this. And if the commissioner had to go back to the ALJ and say, here's a perfect opinion or a perfect decision on this, the ALJ's decision would have included something on fecal incontinence. But in this case, it didn't. And the question for the court is whether substantial evidence supports the finding that she's not credible. But quite specifically, when she says she can do laundry, household chores, care for her children, do grocery shopping, and exercise, and that proves that she has more residual functional capacity than she says, that's just not responsive to this particular problem, right? Because she could do all those things because she's at home. I agree, Your Honor, but the commissioner's regulations and this court's rulings have not placed a requirement on the ALJ or the commissioner to specifically address each one of the limitations alleged and find each one of the limitations alleged is not credible. What the ALJ has a responsibility of doing is finding generally whether the claimant is not credible. And the ALJ actually did this in this case and found that she wasn't credible with the arthralgist because by finding that she wasn't credible, that was enough in order to support the ALJ's decision and find it was free of legal error. The entire decision is supported by substantial evidence and free of reversible legal error. The commissioner would agree, Judge Berzon, that we do want the ALJ to have an opinion that is specific. We do want the ALJ to find that impairments are severe. One last point about the severity of the fecal incontinence and the sphincter tone. Everybody agrees, it appears from the record, that the real problem is diabetes. And the problem with the sphincter tone was diabetic neuropathy related. And diabetic neuropathy was found to be a severe impairment. So he did find it was a severe impairment and, again, it goes over to step four. And it goes over to the residual functional capacity finding. And the ALJ did find that she retained the residual functional capacity to perform a range of work. And the vocational expert testified that with that residual functional capacity and the other vocational factors that she could perform a significant number of jobs in the regional and national economy. Subject to any further questions? I don't think so, Mr. Berger. Thank you very much. You used up your time. If you want to take one minute and rebuttal. Thank you. I appreciate the opportunity for one minute, and I'll limit it to that. The issue here, if the ALJ had not excluded fecal incontinence and got rid of it, he could not have made the credibility finding that he did. If he had included that as an impairment, he would have to address that in terms of the credibility finding at page 22. But he didn't have to do that because he simply ignored it. In terms of counsel's comment that no doctor, none of the doctors reported that, did they? I mean, there was no doctor reported the fecal incontinence. There are a number. I think there are three separate reports of fecal incontinence throughout the records. But restricting her ability to work. The doctors made no comment in terms of how that would impact work. They said here was the condition. That was the condition the judge ignored. But she testified the only problem is the odor. That's all she testified to. She testified to two parts, the odor, but the fact that in spite of wearing pads on occasion, she's got to literally change, go home and shower, change clothes. And that's the interruption in work. Thank you. Thank you very much, gentlemen. The case argue is submitted. 0735602, Lund versus Astru. You look a lot like the last guy. I heard that before.
judges: Silverman, Berzon, Mahan